# EXHIBIT B

**Bidding Procedures**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

BANK OF AMERICA, N.A.,      :

     :

     Plaintiff,      :    CASE NO. 1:25-cv-01061

     :

v.      :    Judge Charles Esque Fleming

     :

THE NOTRE DAME COLLEGE, *et al.,*   :    Magistrate Judge Jonathan D. Greenberg

     :

     Defendants.      :

On _____, 2026, the United States District Court for the Northern District of Ohio (the **"Court"**) entered an Order (the **"Bidding Procedures Order"**), by which the Court approved the bidding procedures set forth herein (the **"Bidding Procedures"**). These Bidding Procedures establish the process by which the Receiver is authorized to conduct a public auction (the **"Auction"**) for the sale of the Properties and any personal property as more fully set forth in the form Purchase and Sale Agreement attached hereto as **Exhibit 2.**[1] A list of Permanent Parcel Numbers that comprise the Properties is attached hereto as **Exhibit 1.**

1. **Key Dates**

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Receiver and to submit Bids (as defined below) for the Properties or any subset of the Properties (to include any associated personal property to be purchased as part of the Bid). The Receiver with the assistance of Keen-Summit Capital Partners

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Motion, Bidding Procedures Order or the PSA, as applicable.

37299046.9

LLC, a Colorado limited liability company (**"Keen"**), the Receiver's real estate broker for the Properties will assist interested parties in conducting their respective due diligence investigations.

The key dates for the sale process are as follows:

| Event | Deadlines |
|---|---|
| Deadline to Serve Court-Approved Bidding Procedures | Within two (2) Business Days of entry of the Bidding Procedures Order |
| Deadline to File Notice of Stalking Horse Bidder or Notice of No Stalking Horse Bidder | April 17, 2026[2] |
| Deadline to Submit Qualified Bids (the "Bid Deadline") | May 1, 2026 at 5:00 p.m. (Eastern Time). |
| Deadline to Either (1) Notify Qualified Bidders of Auction or (2) Cancel Auction | May 5, 2026 |
| Auction, if held | May 7, 2026 |
| Deadline to File Notice of Successful Bidder and Motion for Final Approval of the Sale | May 11, 2026 |
| Deadline to File Objections to the Sale Motion | May 18, 2026 |
| Reply Deadline to Sale Objections | May 21, 2026 |

---

[2] The Receiver reserves the right to modify the Bidding Procedures, the bid increments, and the deadlines in his reasonable business judgment, with the written consent of Plaintiff, Bank of America, N.A., in any manner that will best promote the goals of maximizing the value of the Properties, the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale, including, without limitation, extending or shortening the deadlines set forth in these Bidding Procedures.

37299046.9

| | |
|---|---|
| Sale Hearing | May [27, 28, or 29] 2026 at _____ ET[3] |
| Sale Closing | On or before June 30, 2026 |

**2. Consultation Parties.**

(a)     Except as set forth in Section 2(b) below, the **"Consultation Parties"** referred to herein consist of the following entities, solely with respect to parcels subject to their respective liens or owner interests:

i.      Plaintiff; and

ii.     Any other person or entity as agreed to by Receiver.

(b)     If any of the persons or entities listed in paragraph 2(a) above submits a Bid (other than a credit bid), such person shall no longer be a Consultation Party for purposes of these Bidding Procedures. The Receiver shall not consult with Plaintiff if determining whether a bid submitted by Plaintiff is a higher or better bid unless such bid is a credit bid.

**3. Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale (a **"Potential Bidder"**) must deliver or have previously delivered to the Receiver the following documents: and

(a)     an executed non-disclosure agreement (an **"NDA"**) on terms acceptable to the Receiver, in substantially the form attached hereto as **Exhibit 3**;

---

[3] Holding a hearing on one of those dates will allow the parties (i) to close by June 30, 2026, after the 30-day appeal process has run, and (ii) to comply with the 20-day notice requirement to the Ohio Attorney General under Ohio law and paragraph J of the Order Appointing Receiver. Moreover, the Liquidation and Funding Agreement with Plaintiff, Bank of America, N.A., requires a closing of the sale(s) on or before June 30, 2026.

4

(b)     identification of the Potential Bidder and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction.

**4.     Provisions Governing Joint Bid Discussions.**

If a Potential Bidder is interested in engaging in discussions with a third party concerning a potential joint Bid (**"Joint Bid"**) for the purchase of the Properties or any subset of the Properties and any related personal property, such Potential Bidder shall, prior to engaging in such discussions, receive the Receiver's written consent to engage in such discussions (the **"Joint Bid Discussion Protocol"**).

**5.     No Collusion**

All bidders, including Potential Bidders and Qualified Bidders (defined below), are expressly prohibited from directly or indirectly colluding or taking any other action in restraint of free competitive bidding in connection with the sale process.

**6.     Qualified Bidders**

(a)     A "Qualified Bidder" is a Potential Bidder who satisfies these Bidding Procedures and whose financial information, the financial information of its equity holder(s), or written commitments, as applicable, demonstrate the financial capability to consummate the sale, whose Bid is a Qualified Bid, and that the Receiver determines should be considered a Qualified Bidder, in consultation with the Consultation Parties. No later than five (5) Business Days after the Bid Deadline, the Receiver will notify each Potential Bidder in writing (email being sufficient) whether such Potential Bidder is a Qualified Bidder and shall provide counsel to the Consultation Parties copies of each Qualified Bid.

37299046.9

(b) If the Receiver in his discretion determines any Potential Bidder not to be a Qualified Bidder, the Receiver will refund such Qualified Bidder's Deposit (defined below) on or within five (5) business days after the Bid Deadline.

(c) Without the written consent of the Receiver, after consultation with the Consultation Parties, a Qualified Bidder may not modify or amend its Qualified Bid, except for proposed amendments to increase its consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

(d) Creditors who have a valid and perfected lien on any of the Properties ("Secured Creditor(s)") shall be deemed Potential Bidders and Qualified Bidders under and in connection with these Bidding Procedures and may credit bid all or any portion of the College's outstanding obligations to such Secured Creditor; and (b) any credit bid made by a Secured Creditor (or any designee) by the Bid Deadline is, and will be deemed to be, a Qualified Bid in each instance for all purposes under and in connection with the Bidding Procedures; provided, however, that nothing herein constitutes a waiver of the Receiver's rights to challenge the liens and claims of Secured Creditors. Any credit bid made by a Successful Bidder must include a cash component sufficient to pay the Bid Protections, the costs and expenses of the sale(s), any fees and expenses that will be payable by the Receiver to Keen at closing, other fees and costs of any professional retained by the Receiver, and other expenses of the receivership estate as required by the Receiver.

7. **Due Diligence**

37299046.9

No Potential Bidder will be permitted to conduct due diligence without signing an NDA in substantially the form attached hereto as **Exhibit 3**. The Receiver will provide to each Potential Bidder that satisfies the foregoing reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request. For all Potential Bidders, the due diligence period will end on the Bid Deadline. The Receiver shall have no obligation to furnish any due diligence information after the Bid Deadline. Neither the Receiver nor his professionals make any representations as to the completeness or accuracy of information provided to Potential Bidders in relation to the sale of the Properties and related personal property.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Receiver or his advisors regarding the ability of the Potential Bidder to consummate a sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Receiver to determine that such bidder is not a Qualified Bidder or that a Bid made by such bidder is not a Qualified Bid.

All due diligence requests should be directed to Keen-Summit Capital Partners LLC, Attn: Matthew Bordwin (mbordwin@Keen-Summit.com) 646-381-9202, and Chris Mahoney (cmahoney@Keen-Summit.com) 646-381-9205).

8. **Bid Requirements.**

A proposal, solicitation, or offer for a purchase and sale of the Properties or any subset thereof and the related personal property (each, a **"Bid"**) by a bidder that is submitted in writing and satisfies each of the following requirements (the **"Bid Requirements"**) as determined by the Receiver, in his discretion and in consultation with the Consultation Parties, shall constitute a **"Qualified Bid"**:

37299046.9

(a)    Identity: Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation. Each Bid must also include contact information for the specific persons, including financial advisors and counsel, if any, that the Receiver's advisors should contact regarding such Bid.

(b)    Purchase Price. Each Bid must clearly set forth the purchase price in U.S. dollars to be paid for the Properties or any subset thereof and the specific personal property (the **"Purchase Price"**).

(c)    Deposit. On or before the Bid Deadline, each Bid must be accompanied by a deposit in the amount equal to ten percent (10%) of the aggregate cash Purchase Price of the Bid, to be held together with other bidders' cash deposits in a non-interest-bearing account to be established by the Receiver (the **"Deposit"**).  For the avoidance of doubt, the Deposit requirement only applies to the cash Purchase Price of a Bid and does not apply to the credit bid portion of a Bid.

(d)    Assumption of Obligations. Each Bid must clearly state which liabilities the Bidder agrees to assume, if any.

(e)    Qualified Bid Documents. Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid, as well as all other material documents integral to such Bid (the **"Qualified Bid Documents"**). Such documents must be based on and marked against form documents provided by the Receiver (including a summary of each Bid as may be reasonably requested by the Receiver). Any modifications to the form of documents provided by the Receiver must be in form and substance acceptable to the Receiver, in consultation with the Consultation Parties, to be considered Qualified Bid Documents.

37299046.9

(f)     <u>No Material Modifications to Stalking Horse PSA or Credit Bid PSA, as Applicable.</u> After either the Notice of Stalking Horse Bidder or No Notice of Stalking Horse Bidder is filed with the Court, all further Bids must be submitted on the form of asset purchase agreement attached to either the Notice of Stalking Horse Bidder (which will include the Stalking Horse PSA from the Stalking Horse Bidder) or the Notice of No Stalking Horse Bidder (which shall be the form of Purchase and Sale Agreement attached hereto as **Exhibit 2**), as applicable, and include all material terms in the applicable PSA, including the following:

1.     <u>No Representations and Warranties by the Receiver:</u> The sale will be "as is", "where is", and "with all faults," without representations or warranties, and without recourse. Each Bidder will represent that it has relied solely on its independent diligence, and not on any representations of the Receiver or his agents, in formulating and submitting its Bid.

2.     <u>Free and Clear:</u> The sale will be free and clear of liens, claims and encumbrances, other than easements, rights of way and other encumbrances running with the land, (the "Interests") to the fullest extent permitted by applicable law and such liens, claims and encumbrances shall attach to the proceeds of such sale with the same validity, priority, and extent as existed immediately prior to such sale.

(g)     <u>Proof of Financial Capacity to Close All-Cash.</u> To the extent that a Bid is not accompanied by evidence of the Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution documented to the satisfaction of the Receiver, in consultation with the Consultation Parties, that demonstrates that the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid. Such funding

37299046.9

commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Receiver after consultation with the Consultation Parties.

(h)     Contingencies. A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

(i)     Time Frame for Closing. Closing must occur on or before June 30, 2026, unless otherwise agreed to in writing by the Receiver after consultation with the Consultation Parties.

(j)     Binding and Irrevocable. A Qualified Bidder's Bid shall be binding and irrevocable unless and until the Receiver accepts a higher Bid and such Qualified Bidder is not selected as the Backup Bidder until the earlier of (i) the closing of the sale, or (ii) 45-days following entry of a Court order approving the sale (the "**Irrevocability Period**").

(k)     Expenses and Disclaimer of Fees. Apart from the Qualified Bid submitted by the Stalking Horse Bidder, if any, each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, with the exception of the Stalking Horse Bidder, no Qualified Bidder will be permitted to request, nor be granted by the Receiver, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis.

(1)     Authorization. Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Receiver) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

37299046.9

(m) <u>Completed Diligence.</u> Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Properties and related personal property prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Properties or the personal property in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Properties or the personal property or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid.

(n) <u>Adherence to Bidding Procedures.</u> By submitting its Bid, each Bidder shall be deemed to have agreed to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid not in conformity with these Bidding Procedures or seek to reopen the Auction after conclusion of the Auction.

(o) <u>Consent to Jurisdiction.</u> Each Qualified Bidder shall be deemed to have submitted to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Receiver's qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the sale documents, and the Closing, as applicable.

(p) <u>Joint Bids.</u> Joint Bids are permitted, provided that the Qualified Bidders have complied with the Joint Bid Discussion Protocol.

(q) <u>Bid Deadline.</u> Each Bid must be transmitted via email (in .pdf or similar format) so as to be actually received on or before the Bid Deadline by: (a) the Receiver, David Baker (dbaker@auroramp.com); (b) Counsel to the Receiver: McDonald Hopkins LLC, Attn: Shawn Riley (sriley@mcdonaldhopkins.com) and Scott Opincar (sopincar@mcdonaldhopkins.com); (c)

11

the Receiver's broker, Keen-Summit Capital Partners LLC, Attn: Matthew Bordwin (mbordwin@Keen-Summit.com) and Chris Mahoney (cmahoney@Keen-Summit.com); and (d) Counsel for Plaintiff: Miles & Stockbridge, Attn. Linda Donhauser (ldonhauser@milesstockbridge.com).

(r)     Bidder warrants and represents that it is a principal acting on its own behalf, and not as a broker, finder or agent acting on another's behalf.  Bidder acknowledges that it will not look to the Receiver and/or Keen and their respective representatives for the payment of any fee or commission. Receiver is compensating Keen pursuant to a separate Court approved agreement.  In addition, Bidder agrees to be responsible for the payment of any fee, commission or other compensation payable to any broker, finder or agent who alleges it has dealt with or through Bidder. Bidder hereby agrees to indemnify, defend and hold the Receiver and Keen and their respective representatives harmless from and against any and all claims, damages, losses and liabilities, costs and expenses (including reasonable attorneys' fees and disbursements) arising out of any claim or claims by any broker, finder or similar agent for commissions, fees or other compensation who allege that they have dealt with the Receiver and/or Keen in connection with the Properties.  Bidder understands that the Receiver and Keen and their respective representatives have not agreed to pay any brokerage commissions, finder's fee or other compensation in connection with Bidder's possible purchase.  If Bidder is working with a broker or finder other than Keen (as defined above), Bidder agrees that Bidder shall be responsible for the payment of any fees, if any, to such broker or finder.

**9.     Designation of Stalking Horse; Election to Move Forward with Credit Bid**

Pursuant to the Bidding Procedures Order, the Receiver is authorized, but not obligated, in his discretion and in consultation with the Consultation Parties, to designate a "Stalking Horse Bidder"

37299046.9

for the Properties and personal property by filing a Notice of Stalking Horse Bidder with the Court, which will entitle such Stalking Horse Bidder to bid protections not to exceed two percent (2%) in the aggregate of the initial cash Purchase Price set forth in the Stalking Horse PSA (the **"Bid Protections"**). If the Receiver designates a Stalking Horse Bidder, he will file a Notice of Stalking Horse Bidder with the Court that will include a purchase and sale agreement with the Stalking Horse (the **"Stalking Horse PSA"**). Bidders wishing to submit Qualified Bids must submit their Bid on the form of Stalking Horse PSA attached to the Notice of Stalking Horse Bidder along with a redline showing any revisions to the Stalking Horse PSA.

Alternatively, the Receiver, in consultation with the Consultation Parties, may chose not to designate a Stalking Horse Bidder. If the Receiver does not designate a Stalking Horse Bidder, he will file a Notice of No Stalking Horse Bidder with the Court. Bidders wishing to submit Qualified Bids must submit their Bid on the form of Purchase and Sale Agreement attached hereto as **Exhibit 2**). Parties submitting credit bids will not be eligible to receive Bid Protections.

**10.    Auction**

If the Receiver receives more than one Qualified Bid for the Properties or any subset thereof, he will conduct the Auction to determine the Successful Bidder.

No later than the commencement of the Auction, the Receiver shall notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Properties or any subset thereof and the personal property, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, as applicable (the **"Baseline Bid"**). The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Receiver reasonably deems, in consultation with the Consultation Parties, relevant to the value of the Qualified Bid, including, but not limited to: (a) the

37299046.9

amount and nature of the total consideration payable to the Receiver; (b) the likelihood of the Qualified Bidder's ability to close the sale and the timing thereof; and (c) the net economic effect of the value to be received by the Receiver from the transaction contemplated by the Qualified Bid Documents, including in light of the effect of any Bid Protections (collectively, the **"Bid Assessment Criteria"**).

The Auction shall take place on or about May 7, 2026, or such earlier or later date and time, and by such other means, as selected by the Receiver in consultation with the Consultation Parties. The Receiver shall maintain a written or recorded transcript of the Auction. Remote participation by Qualified Bidders at the Auction will be permitted or denied in the Receiver's sole discretion. The Auction shall take place at the office of McDonald Hopkins LLC located at 600 Superior Avenue, East, Suite 2100, Cleveland, Ohio 441114 or (ii) such other location as determined by the Receiver in the Receiver's sole discretion after consultation with the Consultation Parties.

(a)     The Receiver Shall Conduct the Auction.

The Receiver, Keen, or the Receiver's designee shall direct and preside over the Auction. At the start of the Auction, the Receiver or his designee shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Receiver shall maintain a written or recorded transcript of the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only (i) Qualified Bidders and their legal and financial advisors and (ii) the members of, and advisors to, the Consultation Parties shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person or via Zoom, as determined by the Receiver, and may

37299046.9

speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to Bid at the Auction. The Receiver may allow other parties to attend the Auction in his discretion.

(b) Terms of Overbid.

**"Overbid"** means any Bid made at the Auction by a Qualified Bidder after the Receiver's announcement of the Baseline Bid. Each applicable Overbid must comply with the following conditions:

*i.* *Minimum Initial Overbid.* The first overbid at the Auction (the **"Minimum Initial Overbid"**) shall be in an amount not less than the purchase price set forth in either the Stalking Horse PSA, if there is one, plus an amount equal to the Bid Protections, if any, plus an additional $250,000.00 (the **"Initial Overbid Amount"**). The amount of the Initial Overbid shall be included in the Notice of Stalking Horse Bidder or Notice of No Stalking Horse Bidder, as applicable, filed with the Court.

*ii.* *Minimum Overbid Increment.* Any Overbid following the Minimum Initial Overbid or following any subsequent Prevailing Highest Bid (as defined below) for the Properties and Related Property shall be in increments of $100,000.00. The Receiver may establish different overbid increments at the Auction, as determined by the Receiver in the exercise of his business judgment, in consultation with the Consultation Parties.

*iii.* *Conclusion of Each Overbid Round.* Upon the solicitation of each round of Overbids, the Receiver may announce a deadline (as he may, in his business judgment, extend from time to time, the **"Overbid Round Deadline"**) by which time any Overbids must be submitted to the Receiver.

37299046.9

Subsequent to each Overbid Round Deadline, the Receiver shall announce whether he has identified, after consultation with the Consultation Parties, an Overbid as being higher or otherwise better than the Baseline Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Receiver as the prevailing highest or otherwise best Bid (the **"Prevailing Highest Bid"**). The Receiver shall describe to all Qualified Bidders the material terms of any new Overbid designated by him as the Prevailing Highest Bid as well as the value attributable by the Receiver (after consultation with the Consultation Parties) to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

*iv.* *Overbid Alterations.* An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable than any prior Bid or Overbid, as determined in the Receiver's reasonable business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures.

(c)    Consideration of Overbids.

The Receiver reserves the right, in his reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Receiver and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Receiver with such additional evidence as the Receiver, in his reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

16

(d)   Closing the Auction.

i.   The Auction shall continue until there is only one Qualified Bid that the Receiver determines, in his reasonable business judgment, and in consultation with the Consultation Parties, to be the highest or otherwise best Bid. Such Qualified Bid shall be declared the **"Successful Bid,"** and such Qualified Bidder, the **"Successful Bidder"** and at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then-Prevailing Highest Bid. The Receiver's acceptance of the Successful Bid is conditioned upon Court approval at the Sale Hearing.

ii.   The Receiver shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

iii.   No later than six business days after the Auction, the Receiver shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid (defined below) to be filed with the Court.

(e)   No Collusion; Good Faith *Bona Fide* Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Qualified Bid is a good-faith bona fide offer, and it intends to consummate the proposed transaction if selected as the Successful Bidder.

(f)   Cancellation of Auction.

37299046.9

If the Receiver does not receive a competing Qualified Bid by the Bid Deadline, then the Receiver may file a notice cancelling the Auction and designating the sole Qualified Bidder as the Successful Bidder.

## 11. Backup Bidder

The Qualified Bidder with the next highest or otherwise second-best Qualified Bid (the **"Backup Bid"**) at the Auction, as determined by the Receiver in the exercise of his business judgment and in consultation with the Consultation Parties shall be required to serve as a backup bidder (the **"Backup Bidder"**). The Receiver shall announce the identity of any Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder at the conclusion of the Auction at the same time the Receiver announces the identity of the Successful Bidder. Unless otherwise agreed in writing by the Receiver in consultation with the Consultation Parties, the Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the closing of the transaction with the Successful Bidder. The Backup Bidder's Deposit shall be held by the Receiver until the closing of the transaction with the Successful Bidder. If the Successful Bidder fails to consummate its Successful Bid, the Receiver may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed the Successful Bidder for all purposes. The Receiver will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Receiver, and the Receiver specifically reserves the right to seek all available remedies against the defaulting Successful Bidder, including specific performance.

## 12. Reservation of Rights.

37299046.9

The Receiver reserves the right to modify these Bidding Procedures in his reasonable business judgment, and in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids.

1. At the conclusion of the Auction, both the Successful Bidder and the Back-up Bidder shall, within two (2) days after the conclusion of the Auction, update and re-execute their respective purchase and sale agreements and any other agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid and the Back-up Bid were made, and deliver the same to counsel to the Receiver.

2. Within two (2) Business Days after the conclusion of the Auction, the Successful Bidder shall supplement its Deposit so that immediately following the Auction, its aggregate deposit being held by Receiver equals ten percent (10%) of the Successful Bid.

**13. Sale Hearing.**

The hearing to approve the sale (the **"Sale Hearing"**) shall take place in the courtroom of the Honorable Charles Esque Fleming, in the United States District Court for the Northern District of Ohio, Carl B. Stokes United States Courthouse, 801 West Superior Avenue, Cleveland, Ohio 44113-1838, Courtroom 17A, on May [27, 28 or 29], **2026, at _____ a.m./p.m. (ET).** Following the conclusion of the Auction, with the consent of the Successful Bidder (in consultation with the Consultation Parties), or as otherwise directed by the Court, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the docket in the above-captioned case. At the Sale Hearing, the Receiver shall present the Successful Bid to the Court for approval.

## 14.     Return of Deposit.

The Deposit of the Successful Bidder shall be applied to the Purchase Price at closing. The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Receiver in his sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after expiration of the Irrevocability Period.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Receiver will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Receiver as damages, in addition to any and all rights, remedies, or causes of action that may be available to the Receiver, and the Receiver shall be free to consummate the proposed transaction with the Backup Bidder without the need for an additional hearing or order of the Court.

Dated: January 15, 2026

Respectfully submitted,

/s/ Scott N. Opincar
Shawn M. Riley (0037235)
Scott N. Opincar (0064027)
McDonald Hopkins LLC
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114
Telephone: (216) 348-5753
Facsimile: (216) 348-5474
Email: sriley@mcdonaldhopkins.com
          sopincar@mcdonaldhopkins.com

Counsel to the Receiver, David M. Baker

37299046.9

# EXHIBIT 1 TO BIDDING PROCEDURES

## List of Permanent Parcel Numbers

| Parcel No. | Permanent Parcel Number (PPN) | Associated Street Address (per commitment) |
|---|---|---|
| 2 | 703-18-001 | 4545 College Road, South Euclid, OH 44121 |
| 5 | 703-17-019 | 1857 Lawnway Road, South Euclid, OH 44121 |

37299046.9

# **EXHIBIT 2 TO BIDDING PROCEDURES**

## Form of Purchase Agreement

<u>**ASSET PURCHASE AGREEMENT**</u>

**THIS ASSET PURCHASE AGREEMENT** (the "<u>Agreement</u>") is made and entered into as of the ___ day of _____, 2026, by and between David M. Baker, solely in his capacity as the court-appointed receiver together with Aurora Management Partners ("<u>Seller</u>") for certain property of The Notre Dame College (the "<u>College</u>"), and _____ ("<u>Purchaser</u>"). Purchaser and Seller shall each be referred to herein as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

<u>**RECITALS:**</u>

A.  By an Order Appointing Aurora Management Partners and David Baker as Receiver ("<u>Receiver</u>") for Certain Property of The Notre Dame College (the "<u>Receivership Order</u>"), the Receiver was appointed by the United States District Court for the Northern District of Ohio (the "<u>Receivership Court</u>") to serve as Receiver in the case of *Bank of America, N.A. vs. The Notre Dame College, et. al., Case No. 1:25-cv-01061* (the "<u>Receivership Case</u>").

B.  Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, certain of the assets owned by the College referred to herein as the Purchased Assets (as defined below), upon the terms and subject to the conditions set forth herein.

C.  The Receiver has determined, in its business judgment, following consultation with its advisors and Bank of America, N.A., and after consideration of available alternatives, that a sale of the Purchased Assets to Purchaser in accordance with the terms and conditions of this Agreement is in the best interest of the Seller and the College's creditors and is the best way for the Receiver to fulfill its duties under the Receivership Order.

<u>**AGREEMENT**</u>

**NOW, THEREFORE,** for and in consideration of the premises, mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

<u>**ARTICLE I**</u>
<u>**DEFINITIONS**</u>

Capitalized terms used herein shall have the meanings ascribed to them in this <u>Article I</u> unless such terms are defined elsewhere in this Agreement.

1.1  <u>Closing</u>: means consummation of the transactions contemplated by this Agreement, including the sale of Purchased Assets to Purchaser.

1.2  <u>Effective Time</u>: means 12:01 a.m. prevailing Eastern Time on the Closing Date.

1.3     Improvements: means all buildings, structures, fixtures and other improvements now or hereafter located on, over and under the Land (defined below) including, without limitation, all irrigation and water control systems, utility lines and related fixtures and improvements, drainage facilities, landscaping, fencing, signs, roadways, walkways and parking facilities.

1.4     Land: means those certain tracts of land or parcels of real property, located in Cuyahoga County, State of Ohio, the description of which is set forth in Exhibit A, which is attached hereto and incorporated herein by reference.

1.5     Operative Documents: means this Agreement and all other documents executed and delivered by Seller and/or Purchaser at Closing.

1.6     Overbid: shall have the meaning given to it in Exhibit B to that certain *Motion for Entry of an Order (A) Authorizing Sale of Non-Residential Real Property of The Notre Dame College Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Approving Sale Procedures and Manner of Notice; (C) Scheduling a Hearing to Consider Final Approval of Sales and Related Matters; and (D) Granting Related Relief* filed by the Receiver in the Receivership Court on January 15, 2026.

1.7     Personal Property: shall have the meaning given to it in Exhibit B hereof.

1.8     Purchased Assets: means Seller's and/or the College's rights, title, and interests in those certain Purchased Assets listed and described on Exhibit B, which is attached hereto and incorporated herein by reference.

1.9     Purchase Price: shall have the meaning given to it in Section 3.1 hereof.

1.10    Real Property: shall have the meaning given to it in Exhibit B hereof.

1.11    Sale Order: shall mean an Order of the Receivership Court approving the sale of the Purchased Assets to the Purchaser in accordance with the terms and conditions of this Agreement.

## ARTICLE II
## SALE AND PURCHASE OF THE PURCHASED ASSETS

2.1     Sale and Purchase of the Purchased Assets. Subject to all of the terms and conditions of this Agreement and in reliance upon the representations and warranties contained herein, at the Closing, Seller shall sell, transfer and deliver to Purchaser all of Seller's and/or the College's rights, title and interest in the Purchased Assets, free and clear of any encumbrances, liens or claims, other than easements, rights in favor of utilities and governmental entities. The Purchased Assets shall be conveyed "**AS IS**", "**WHERE IS**" and "**WITH ALL FAULTS**" without any warranty, whether expressed or implied, including but not limited to, any warranty of merchantability, fitness for a particular purpose or otherwise as more fully set forth in Section 6.3 hereof.

37397758.1

2.2     Excluded Assets. Other than the Purchased Assets, all other assets of the College are being retained by Seller and are not being sold to Purchaser under this Agreement, including any funds of the College that are endowment funds.

2.3     Assumption of Liabilities. At the Closing, Purchaser shall not assume, or in any way be responsible or liable for, any liability, obligation, claim or expense of Seller other than those assumed liabilities set forth on schedule 1 attached hereto, which is incorporated herein by reference. On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing and effective as of the Closing, Purchaser shall timely perform and discharge in accordance with their respective terms, all liabilities incurred by Purchaser arising out of Purchaser's ownership, use or occupancy of the Purchased Assets after the Closing Date for events which take place after the Closing Date.

### ARTICLE III
### PURCHASE PRICE

3.1     Purchase Price. The consideration to be paid for the Purchased Assets by Purchaser to Seller at the Closing shall be via wire transfer of good and collected funds in the amount of _____ ($_____) Dollars (the "Purchase Price").

3.2     Manner of Payment. Purchaser shall pay to Seller the Purchase Price as follows:

        (a)     A deposit equal to ten percent (10%) of the Purchase Price, more specifically, the amount of _____ ($_____) Dollars (the "Deposit"), which shall be paid by Purchaser to Chicago Title Insurance Company (the "Title Company"), in cash via wire transfer of immediately available funds upon the execution and delivery of this Agreement by Seller. The Parties acknowledge and agree that the Deposit shall be held by the Title Company in escrow in a non-interest-bearing trust account. The Deposit is non-refundable in the event the Purchaser breaches or defaults in the full and timely performance and satisfaction of any of its representations, warranties, covenants or obligations under this Agreement. The Deposit shall be (i) credited against the Purchase Price, or (ii) otherwise released in accordance with the terms and conditions of this Agreement and/or further order of the Receivership Court.

        (b)     At Closing, Purchaser shall deliver to Seller (via the Title Company's escrow)_____ ($_____) Dollars in cash via wire transfer of immediately available funds, which together represents the balance of the Purchase Price (the "Closing Payment").

3.3     Allocation. Prior to the Closing Date, Seller and Purchaser shall agree on an allocation of the Purchase Price for the Purchased Assets. All allocations pursuant to this Section 3.3 shall be made in conformance with Federal and State law, and Purchaser and Seller agree to file their respective tax returns and reports (federal, state and local) consistent therewith in all respects.

37397758.1

# ARTICLE IV
## RESERVED
### PROCEDURES FOR BIDDING AND RECEIVERSHIP COURT APPROVAL

4.1 <u>Stalking Horse Agreement and Bidding Procedures</u>. From and after the date hereof, Seller and/or Purchaser, in each case as indicated below, covenant and agree as follows (in each case, to the extent not already performed as of the date hereof):

(a) As promptly as practicable after the execution of this Agreement, Seller shall issue a notice to those parties whom Seller, in its discretion, has determined to be potentially qualified prospective bidders that Seller has signed this Agreement as the "Stalking Horse Agreement". The Receiver also shall file such notice in the Receivership Case of Seller's entry into this Agreement as the Stalking Horse Agreement, with a copy of this Agreement to be attached to the notice.

(b) In the event that Seller receives one or more Overbids which Receiver, in its sole discretion, determines to be a qualified Overbid, the Receiver shall schedule an auction (the "Auction").

(c) At the conclusion of the Auction, the Receiver shall select the winning bid based on the Receiver's determination, in its sole discretion, of which bid is the highest or best bid. The Receiver also may select, in the Receiver's sole discretion, the second best bid, which shall be designated as the "Back-up Bidder", with the understanding that if for any reason the winning bidder were to fail to close as required by the applicable purchase agreement approved by the Receivership Court, the Back-up Bidder shall be authorized and obligated to close on its bid for the purchase of the Purchased Assets approved by the Receivership Court.

(d) In the event that Purchaser is selected as the Back-Up Bidder, but closing is held by Seller with highest or best bidder, Seller shall cause the Title Company to promptly return the Deposit to Purchaser hereunder.

(e) In the event that Purchaser is not the purchaser of the Purchased Assets because Seller closes a sale of the Purchased Assets with another bidder, Seller shall make a payment to Purchaser for reimbursement of expenses reasonably incurred by Purchaser in connection with its due diligence and efforts to enter into this Agreement and its participation in the auction, up to a maximum amount of two percent (2%) of the Purchase Price _____ ($_____) Dollars (the "Break-Up Fee"), subject to submission to Seller of reasonable documentation supporting the reimbursement request. Such Break-Up Fee shall be paid by Seller to Purchaser hereunder from the proceeds of and at the closing on the sale of the Purchased Assets approved by the Receivership Court. This provision shall survive the termination of this Agreement.

(f) Notwithstanding any of the provisions set forth in 5.1(b), (c), and (d) above, Receiver shall reserve the right, in its sole discretion, to terminate the bidding process and accept a revised purchase offer from Purchaser substantially similar to this Agreement with amendments that eliminate all conditions for Purchaser's obligations to close other than entry of the Sale Order (a "<u>Preemptive Amended Purchase Agreement</u>").

37397758.1

4.2     Receivership Court Approval. Promptly after the conclusion of the Auction, or in the event that the Receiver receives no timely Overbids or the Receiver agrees to and executes a Preemptive Amended Purchase Agreement with Purchaser, the Receiver shall take the actions necessary to promptly and diligently pursue Receivership Court approval of the purchase agreement the Receiver determines to be the highest or best bid in the event an Auction is held, or this Agreement or such Preemptive Amended Purchase Agreement, as the case may be. The Receiver will file a motion for approval of the sale of the Purchased Assets consistent with the terms of this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

5.1     Status and Authority. Seller has all requisite power and authority to execute and deliver this Agreement and the other Operative Documents and to perform its obligations hereunder and thereunder, subject to the approval of the Receivership Court by entry of a Sale Order.

5.2     Enforceability. The Operative Documents, when executed and delivered, shall constitute legal, valid and binding obligations of Seller enforceable in accordance with their terms and conditions, subject to the approval of the Receivership Court by entry of a Sale Order.

**5.3     Limitations on Representations and Warranties and Disclaimer and Release of Liability. EXCEPT FOR THE EXPRESS AND SPECIFIC REPRESENTATIONS AND WARRANTIES OF THE SELLER IN THIS AGREEMENT, THE PURCHASER ACKNOWLEDGES THAT (A) THE SELLER HAS NOT MADE AND THE SELLER HEREBY EXPRESSLY DISCLAIMS AND NEGATES, AND THE PURCHASER HEREBY EXPRESSLY WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, AND (B) THE SELLER EXPRESSLY DISCLAIMS, AND THE PURCHASER HEREBY EXPRESSLY WAIVES, ANY AND ALL LIABILITY AND RESPONSIBILITY OF THE SELLER FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO THE PURCHASER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY SUCH PERSON BY A MEMBER OF THE SELLER'S AGENTS, CONSULTANTS OR REPRESENTATIVES).**

**EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF THE SELLER IN THIS AGREEMENT AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLER EXPRESSLY DISCLAIMS AND NEGATES, AND THE PURCHASER HEREBY WAIVES THE RIGHT TO MAKE ANY CLAIMS FOR RECOVERY AGAINST SELLER FOR ANY AND ALL LOSS OR DAMAGE OR COST TO THE PURCHASER OR TO THE PURCHASED ASSETS ARISING FROM OR RELATING TO, IN WHOLE OR IN PART, THE SALE OF THE PURCHASED ASSETS, OR REGARDING ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, AS TO ANY OF THE**

37397758.1

FOLLOWING: (A) THE ACCURACY, COMPLETENESS OR MATERIALITY OF RECORDS, INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) NOW, HERETOFORE OR HEREAFTER FURNISHED TO THE PURCHASER BY OR ON BEHALF OF THE SELLER; (B) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT RELATING TO THE PURCHASED ASSETS; (C) ANY ESTIMATES OF THE VALUE OF, OR FUTURE REVENUES GENERATED BY, THE PURCHASED ASSETS; (D) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM DEFECTS, WHETHER KNOWN OR UNKNOWN, (E) ANY AND ALL IMPLIED WARRANTIES EXISTING UNDER APPLICABLE LAW; AND (F) THE ENVIRONMENTAL OR OTHER CONDITION OF THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED OR EXPRESS WARRANTY REGARDING ENVIRONMENTAL LAWS, THE RELEASE OF SUBSTANCES, WASTES OR MATERIALS INTO THE ENVIRONMENT, OR PROTECTION OF THE ENVIRONMENT OR HEALTH. IT IS THE EXPRESS INTENTION OF THE PURCHASER AND THE SELLER THAT, EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF THE SELLER IN THIS AGREEMENT, THE PURCHASED ASSETS ARE BEING ACCEPTED BY THE PURCHASER "AS IS, WHERE IS, WITH ALL FAULTS AND DEFECTS" AND IN THEIR PRESENT CONDITION AND STATE OF REPAIR, AND THE PURCHASER HAS MADE OR WILL MAKE SUCH INSPECTIONS AS THE PURCHASER DEEMS APPROPRIATE.

THE SELLER AND THE PURCHASER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN WARRANTIES CONTAINED IN THIS <u>SECTION 6.3</u> ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSES OF ANY SUCH APPLICABLE LAW.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

6.1     <u>Status and Authority</u>. Purchaser has all requisite power and authority to execute and deliver this Agreement and the other Operative Documents and to perform its obligations hereunder and thereunder, and the execution, delivery and performance of this Agreement and the other Operative Documents have been duly authorized by all necessary action on the part of Purchaser.

6.2     <u>Enforceability</u>. The Operative Documents, when executed and delivered, shall constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their terms.

6.3     <u>Ability to Perform</u>. Purchaser shall have at the date of execution of this Agreement and at Closing the financial capacity to perform its obligations under this Agreement.

6.4     <u>Broker</u>. Purchaser hereby represents that, except for and Keen-Summit Capital Partners LLC, a Colorado limited liability company, which was retained by Seller ("Broker"), it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Seller will pay Broker at Closing a commission pursuant to a separate agreement.

37397758.1

6.5     Survival. The representations and warranties contained in this Agreement by the Parties are true, correct and complete and shall be deemed remade by each Party as of the Closing with the same force and effect as if made at that time. The representations and warranties of the Parties set forth in this Agreement, as well as the right and ability of the Parties to enforce the same, shall survive Closing.

## ARTICLE VII
## COVENANTS OF PURCHASER

7.1     Confidentiality. Purchaser hereby agrees that all financial and other information received from or communicated by Seller to it or its employees or representatives shall be used only in connection with the acquisition of the Purchased Assets pursuant to this Agreement. Purchaser shall take such steps as are reasonably appropriate to preclude the disclosure of such information by Purchaser or any of its employees or representatives or the use of such information other than to effect the Closing. In the event this Agreement is terminated prior to Closing without effecting the sale of the Purchased Assets, Purchaser shall return all such information and copies thereof to Seller. The obligations set forth in this Section shall survive the termination of this Agreement. Notwithstanding anything to the contrary, if this Agreement is terminated, then in such event upon the return of all information and copies thereof to Seller, all other obligations of Purchaser as set forth in this Section shall be terminated.

## ARTICLE VIII
## CONDITIONS PRECEDENT; TERMINATION

8.1     Conditions to Obligations of Seller. The Closing of the transaction contemplated pursuant to this Agreement and Seller's obligation to convey the Purchased Assets are subject to satisfaction, prior to the Closing Date, of all of the following conditions, each of which is for the benefit of Seller and may be waived by Seller in its sole discretion:

        (a)     Sale Order. The Sale Order shall have been entered by the Receivership Court in the Receivership Case;

        (b)     Representation and Warranties of Purchaser. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing with the same effect as though made at and as of the Closing;

        (c)     Performance of Obligations. Purchaser shall have duly performed and complied in all respects with all agreements contained herein required to be performed or complied with by Purchaser at or before the Closing; and

        (d)     Actions at Closing. Purchaser shall have taken all actions required to be taken by it at the Closing pursuant to this Agreement.

8.2     Conditions to Obligations of Purchaser. The Closing of the transaction contemplated pursuant to this Agreement and Purchaser's obligation to purchase the Purchased Assets are subject to satisfaction, prior to the Closing Date, of all of the following conditions, each of which is for the benefit of Purchaser and may be waived by Purchaser in its sole discretion:

7

(a)     <u>Representations, Warranties and Covenants True</u>. All of the representations, warranties and covenants of Seller set forth in this Agreement shall be true and correct in all material respects on the Closing Date as though made at the time of the Closing;

(b)     <u>Performance of Obligations</u>. Seller shall have duly performed and complied in all respects with all agreements contained herein required to be performed or complied with by Seller at or before the Closing;

(c)     <u>Sale Order</u>. The Sale Order shall have been entered by the Receivership Court in the Receivership Case;

(d)     <u>Actions at Closing</u>. Seller shall have taken all actions required to be taken by it at the Closing pursuant to this Agreement; and

(e)     <u>Affidavit Pursuant to R.C. 1702.39</u>. Purchaser shall provide any affidavit or similar instrument required pursuant to Ohio Rev. Code Section 1702.39.

8.3     <u>Termination</u>. Notwithstanding anything contained herein to the contrary, this Agreement and the transaction contemplated hereby may be terminated as follows:

(a)     By mutual written agreement of Purchaser and Seller;

(b)     If Purchaser, on the one hand, or Seller, on the other hand, materially breaches or defaults in the full and timely performance and satisfaction of any of its representations, warranties, covenants or obligations under this Agreement, and such breach or default is not cured on or before the fifth (5th) business day after the date written notice is given by the non-defaulting Party to the defaulting Party specifying the nature of such breach or default, then the non-defaulting Party may terminate this Agreement immediately upon notice to the defaulting Party; or

(c)     If any of the conditions set forth in <u>Section 9.2</u> hereof are not satisfied on or before the Closing Date, then Seller may terminate this Agreement by providing Purchaser with notice thereof.

8.4     <u>Remedies Upon Termination</u>.

(a)     <u>Seller's Remedies</u>. In the event Seller tenders full performance of all of its obligations hereunder and this Agreement is terminated by Seller pursuant to <u>Section 9.3(b)</u> or <u>Section 9.3(c)</u> above, the Title Company shall provide to Seller and Seller may retain the Deposit as liquidated damages in lieu of all other damages and remedies available to them at law or in equity. The Parties acknowledge that it is not possible at this time to calculate or determine the damages that Seller might incur should Purchaser default under this Agreement. Purchaser and Seller agree that the retention of the Deposit as liquidated damages is fair and reasonable, should this Agreement be terminated pursuant to <u>Section 9.3(b)</u> or <u>Section 9.3(c)</u> hereof.

(b)     <u>Purchaser's Remedies</u>. In the event Purchaser tenders performance of all of its duties and obligations hereunder and this Agreement is terminated by Purchaser pursuant to <u>Section 9.3(b)</u> or <u>Section 9.3(c)</u> above, then Purchaser's remedy shall be to direct Seller to cause

8

the Title Company to promptly return the Deposit to Purchaser, and in the event Seller completes closing of the sale of the Purchased Assets to another bidder, upon closing of such sale Seller shall reimburse Purchaser for all reasonable fees and expenses incurred by Purchaser in the negotiation and performance of its due diligence in regard to this Agreement up to the maximum amount of the Break-Up Fee. Seller's obligation under this Paragraph 9.4(b) shall survive Purchaser's termination of the Agreement.

(c)     Return of Deposit. If Purchaser and Seller terminate this Agreement pursuant to Section 9.3(a) or if Purchaser terminates this Agreement pursuant to Section 4.1, Section 9.3(b) or Section 9.3(c), Seller shall cause the Title Company to promptly return the Deposit to Purchaser and neither Party shall have any further obligations to the other.

## ARTICLE IX
## CLOSING

9.1     Closing. Time is of the essence for performance of the obligations under this Agreement. The Closing shall take place remotely on the date that is no later than June 30, 2026, unless another time, date and place is agreed to in writing by Seller (the "Closing Date"). At the Closing, the following events shall occur as of the Effective Time, each of the events being deemed to have occurred simultaneously with the other events:

(a)     Seller shall execute and deliver to Purchaser (i) a bill of sale in the form attached hereto as Exhibit C transferring the Personal Property to Purchaser, and (ii) a fiduciary deed conveying title to the Real Property to Purchaser, which shall be in form and substance reasonably satisfactory to Seller and Purchaser.

(b)     The Deposit shall be applied to the Purchase Price.

(c)     Purchaser shall pay the Closing Payment due to Seller (via the escrow of the Title Company) in good and collected funds. Such payment shall be made by wire transfer in lawful money of the United States of America in good and collected funds to an account of Seller as designated by Seller on or prior to the Closing Date.

(d)     The Closing shall be effective as of the Effective Time.

9.2     Prorations. The following prorations shall be made between Seller and Purchaser on the Closing, computed effective as of the Closing:

(a)     Real Property Taxes. All general and special real estate taxes and assessments based on the regular tax bill for the current fiscal year (or, if such tax bill has not been issued as of the date of Closing, the regular tax bill for the fiscal year preceding the current fiscal year) shall be prorated between the Parties at the Closing, on a calendar year basis. In the event such assessment cannot be completed by the Closing, general and special real estate taxes and assessments shall be prorated based upon Seller's and Purchaser's written apportionment statement. In preparing such written apportionment statement, Seller and Purchaser shall apportion said taxes by such reasonable basis as may be mutually agreeable to Purchaser and Seller. Notwithstanding the foregoing, all accrued and/or unpaid real property taxes and assessments including, without limitation, any supplemental tax bills or assessments, with respect to the Real

37397758.1

Property which arise, accrue and/or relate to any time period prior to the Closing shall be the responsibility of Seller. Any supplemental tax bills or assessments with respect to the Real Property which arise, accrue and/or relate to the Closing or any time period after the Closing shall be the responsibility of the Purchaser.

(b) <u>Personal Property Taxes</u>. To the extent applicable, personal property taxes to the Personal Property shall be prorated between Seller and Purchaser as of the Closing.

(c) <u>Sales Taxes</u>. Purchaser shall bear, be responsible for and shall pay for, all sales and use taxes arising out of the sale and transfer by Seller to Purchaser of the Purchased Assets, if any. Seller shall be responsible for and pay for all sales and use taxes incurred prior to the Closing.

(d) <u>Utility Charges</u>. All utility charges applicable to the Real Property shall be prorated between Seller and Purchaser as of the Closing, pursuant to final meter readings. Seller shall be entitled to receive all utility deposits or receive a credit for same at Closing.

(e) <u>Other Payables and Receivables</u>. All account payables and account receivables relating to the operation of the Property prior to the Closing and not otherwise provided for in this <u>Section 10.2</u> or expressly assumed by Purchaser hereunder, shall remain the obligation and property of Seller.

(f) <u>Delinquent Revenues</u>. Seller retains the right to recover all accrued and unpaid amounts that Seller is entitled to receive pursuant to this <u>Section 10.2</u> up to and through the Closing (the "<u>Delinquent Revenues</u>"), including, without limitation, the right to pursue a claim for such amounts against any member and/or third party responsible for payment of such amounts. Without limiting the foregoing, in the event Purchaser receives any Delinquent Revenues, Purchaser hereby agrees to remit the same to Seller within thirty (30) calendar days of Purchaser's receipt thereof. Purchaser may not waive any Delinquent Revenues, nor modify or reduce any Delinquent Revenues which are owed thereunder, for any period in which Seller are entitled to receive such charges or amounts, without first obtaining Seller's prior written consent. Purchaser shall reasonably cooperate with Seller to enforce the provisions of any Delinquent Revenues which require the third parties to pay to Seller such Delinquent Revenues.

## ARTICLE X
## MISCELLANEOUS

10.1 <u>Risk of Loss</u>. Seller shall maintain the Purchased Assets substantially in their current condition as of the date of execution of this Agreement. All risk of loss or damage to the Land and Improvements shall remain with Seller until Closing.

10.2 <u>Modification; Waiver</u>. This Agreement may be modified, amended or supplemented in any manner and at any time only by a written instrument executed by Seller and Purchaser. No waiver by any Party of any term or condition hereof, or the breach of any covenant, agreement, warranty, representation or provision contained herein in any one or more instances shall be made to be or construed as a further continuing waiver of any such term, condition or breach or a waiver of any other term, condition or breach.

37397758.1

10.3    Entire Agreement. This Agreement and the Exhibits hereto (all of which are hereby incorporated herein by reference) constitute the entire agreement and understanding of Seller and Purchaser with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

10.4    Expenses. Whether or not the transactions contemplated herein shall be consummated, each Party shall pay its own expenses incident to the preparation and performance of this Agreement, including expenses of counsel and advisors.

10.5    Rights and Remedies. Except as otherwise expressly provided, the rights and remedies granted under this Agreement shall be the exclusive rights and remedies and shall be in lieu of all other rights and remedies available at law or in equity which are specifically waived by the Parties. The Parties shall not be deemed to waive any of their rights or remedies under this Agreement, unless such waiver is in writing and signed by the Party to be bound. No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy.

10.6    Limitation of Receiver's Liability. THE RECEIVER HAS BEEN APPOINTED AS THE COURT-APPOINTED RECEIVER OF THE PURCHASED ASSETS PURSUANT TO THE RECEIVERSHIP ORDER. ALL ACTIONS AND DEEDS OF RECEIVER, ON BEHALF OF SELLER, IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT ARE IN THE RECEIVER'S CAPACITY AS RECEIVER, AND NEITHER THE RECEIVER NOR ANY OF ITS MEMBERS, OFFICERS, DIRECTORS, EMPLOYEES, PROFESSIONALS OR AGENTS SHALL HAVE ANY LIABILITY EXCEPT FOR RECEIVER'S ACTIONS CONSTITUTING FRAUD OR WILLFUL MISCONDUCT.

10.7    Notices. Any notice shall be in writing or in an electronic form and shall be deemed to have been duly given or made (i) when personally delivered by hand, (ii) upon confirmed delivery by a standard overnight carrier (iii) upon confirmation of receipt of an electronic form delivery by an email or (iv) the expiration of five (5) Business Days after the day when mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows, or to such other addresses as may be furnished hereafter by notice, in writing, to the other Party, to the following parties:

> If to Purchaser, to:
>
> with a copy given in like manner to
> (which shall not constitute notice):
>
> If to the Receiver or Seller, to:
>
> Aurora Management Partners
> 112 South Tryon Street, Suite 1770
> Charlotte, NC 28284
> Attn: David Baker

37397758.1

with a copy given in like manner to
(which shall not constitute notice):

McDonald Hopkins LLC
600 Superior Avenue East
Suite 2100
Cleveland, OH 44114
Attn: Scott N. Opincar, Esquire

Any notice which is delivered or is sent by email shall be deemed to have been validly and effectively given and received on the date it is delivered or sent, unless it is delivered or sent after 5:00 p.m. on any given day or on a day which is not a Business Day, in which case it shall be deemed to have been validly and effectively given and received on the Business Day next following the day it was delivered or sent, provided that, in the case of a notice sent by email, it shall not be deemed to have been sent unless there has been confirmation of transmission.

10.8    Further Actions. Each Party shall execute and deliver such other certificates, agreements, conveyances, certificates of title, and other documents and take such other actions as may reasonably be requested by the other Party in order to consummate or implement the transactions contemplated by this Agreement.

10.9    Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns permitted hereby, but neither this Agreement nor any of the rights, interests or obligations shall be assigned, by operation of law or otherwise by Purchaser without the prior written consent of Seller; provided, however, Purchaser may assign it rights hereunder to an entity in which Purchaser or its ownership has majority ownership and control. Notwithstanding any permitted assignment hereunder, Purchaser shall not be released from its obligations hereunder.

10.10    Severability. If any term or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to either Party.

10.11    Publicity. Seller and Purchaser will cooperate with each other in the development and distribution of all news releases and other public disclosures relating to the transactions contemplated hereby. Neither Seller nor Purchaser shall issue or make, or cause to have issued or made, any press release or announcement concerning the transactions contemplated hereby without the advance approval in writing of the form and substance thereof by the other Party, unless otherwise required by applicable legal requirements or as set forth in Article V above.

10.12    Headings; References. The article and section headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or

interpretation of any provisions hereof. Any reference herein to an article or section shall be deemed to refer to the applicable article or section of this Agreement unless otherwise stated herein. Any reference to a schedule shall be deemed to refer to the applicable schedule attached hereto, all such schedules being incorporated herein by this reference.

10.13 <u>Governing Law</u>. THIS AGREEMENT SHALL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO AND THE FEDERAL LAWS OF THE UNITED STATES OF AMERICA. By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that in the event of any dispute between the Parties arising under this Agreement, any such dispute shall be brought in the Receivership Court, and by execution and delivery of this Agreement, each Party hereby irrevocably accepts and submits itself to the jurisdiction of the Receivership Court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in <u>Section 11.7</u> hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with the provisions of <u>Section 11.7</u> hereof. THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF THE SELLER, THE PURCHASER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

10.14 <u>Pronouns and Plurals</u>. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

10.15 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

10.16 <u>No Third-Party Beneficiary</u>. This Agreement creates rights and duties only between the Parties, and no third party is or shall be deemed to be or shall have any rights as a third-party beneficiary.

10.17 <u>Time of Essence</u>. Time is of the essence of this Agreement.

37397758.1

**WITNESS WHEREOF,** the Parties hereto have caused this Asset Purchase Agreement to be executed as of the date first above written.

SELLER:

By: David M. Baker and Aurora Management Partners, Inc.,
solely in his/its capacity as Receiver

_____

Name: David M. Baker, solely in his capacity as the Court-appointed Receiver and not in his individual capacity
Date:_____

PURCHASER:

By:_____
Name: _____
Title: _____
Date:_____

SCHEDULE 1

**ASSUMED LIABILITIES**

EXHIBIT A

## **LAND**

[Descriptions to be attached]

37327081.4
37397758.1

# EXHIBIT B

## PURCHASED ASSETS

1.      <u>Real Property</u>: The Land and the Improvements described and set forth in the attached <u>Exhibit A</u>, together with (a) all easements, rights-of-way, development rights, entitlements, air rights and appurtenances relating or appertaining to the Land and/or the Improvements (b) all water wells, streams, creeks, ponds, lakes, or other bodies of water in, on or under the Land, whether such rights are riparian, appropriate, prescriptive or otherwise, and all water rights, water allocations and water stock, (c) all sewer, septic and waste disposal rights and interests applicable or appurtenant to and/or used in connection with the operation of the Improvements, (d) all minerals, oil, gas, and other hydrocarbons located in, on or under the Land, not otherwise excepted from the Land, together with all rights to surface or subsurface entry, free and clear of any and all liens, liabilities, encumbrances, exceptions and claims, and (e) the Entitlements (collectively the "<u>Real Property</u>").

2.      <u>Personal Property</u>: All equipment, furniture, tools, appliances, and all other tangible personal property located on the Land or in the Improvements, and including specifically all personal property listed on the attached Personal Property Schedule (the "<u>Personal Property</u>").

3.      <u>Entitlements</u>: All of Seller's right, title and interest in, to and under all land use entitlements, development rights, water allocations, water rights, sewer capacity, density allocations and other rights or approvals relating to or authorizing the ownership, development, and/or operation of the Real Property; all plans and specifications, all contract rights (including any and all guarantees and warranties relating to the construction of any Improvements); all development and land use rights, applications, architectural and engineering plans and reports, specifications and drawings, as-built drawings, maps; all items constituting any due diligence materials; and any documents of the same or similar nature pertaining to the Real Property; and all changes, additions, substitutions and replacements for any of the foregoing.

# PERSONAL PROPERTY SCHEDULE

## See Attached

37327081.4
37397758.1

# EXHIBIT C

## **BILL OF SALE**

David M. Baker, solely in his capacity as the court-appointed receiver together with Aurora Management Partners ("Seller") for certain property of The Notre Dame College (the "College"), for and in consideration of the sum of_____and 00/100 Dollars ($_)  cash and other good and valuable consideration in hand paid, hereby absolutely SELL, TRANSFER and ASSIGN to [___] ("Purchaser"), all of Seller's AND THE College's right, title and interest in and to the Purchased Assets (as such term is defined in that certain Asset Purchase Agreement dated__, 2026 by and between Purchaser and Seller).

THE SALE OF THE PURCHASED ASSETS IS MADE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER. Purchaser shall unconditionally accept the Purchased Assets "AS-IS, WHERE-IS" and neither Seller nor any affiliate of Seller shall be deemed to have made, and Seller hereby expressly disclaim, any representation or warranty, express or implied, as to the value, condition, design, operation, merchantability, quality of materials or workmanship, fitness for use or a particular purpose, manufacture or marketability, of the Purchased Assets, against infringement of any patent or copyright or the like, or freedom from any latent or patent defect (whether or not discoverable), or compliance with law, including, without limitation, any representation or warranty that arises or may be deemed to arise out of any course of performance, course of dealing, or usage of trade, all of which representations and warranties are hereby expressly disclaimed and waived by the Parties hereto.

DATED:_____, 2026.

**SELLER:**

By: David M. Baker and Aurora Management Partners, Inc.,
solely in his/its capacity as Receiver

_____
Name: David M. Baker, solely in his capacity as the Court-appointed Receiver and not in his individual capacity

**PURCHASER:**

By:_____
Name: _____
Title: _____

C-1

37327081.4
37397758.1

# EXHIBIT 3 TO BIDDING PROCEDURES

## Form of NDA

37299046.9

# Non-Disclosure Agreement

This Non-Disclosure Agreement (the "**Agreement**") is entered into as of the date this document is electronically executed on the RevereCRE.com website ("Effective Date"), between, on the one hand, the disclosing party, David M. Baker, solely in his capacity as the court-appointed receiver together with Aurora Management Partners (the "**Receiver**"), for certain property of The Notre Dame College (the "**College**"), and ("**Prospect**"), as defined on the registration page of the RevereCRE.com website, and is being made for the benefit of the Receiver and Bank of America, N.A. ("**Bank of America**"), the lender secured by the Assets (defined below) being offered for sale by the Receiver.

WHEREAS, on November 5, 2025, by an Order Appointing Aurora Management Partners and David Baker as Receiver for Certain Property of The Notre Dame College (the "**Receivership Order**"), the Receiver was appointed by the United States District Court for the Northern District of Ohio (the "**Receivership Court**") to serve as Receiver in the case of Bank of America, N.A. vs. The Notre Dame College, et. al., Case No. 1:25-cv-01061 (the "**Receivership Case**"); and

WHEREAS, the Receiver has determined, in his business judgment, following consultation with his advisors and Plaintiff, Bank of America, N.A., and after consideration of available alternatives, that a public sale of the College's owned nonresidential real property and personal property (collectively, the "**Assets**") is in the best interest of the receivership estate and the College's creditors and is the best way for the Receiver to fulfill his duties under the Receivership Order (the "**Transaction**"); and

WHEREAS, the Receiver, pursuant to an Order of the Receivership Court and the Receivership Order, has engaged Keen-Summit Capital Partners LLC ("**Keen**") to market the Assets, in whole or in parts, for a Transaction; and

WHEREAS, the Receiver, for the sole purpose of consummating a Transaction, wishes to disclose to Prospect certain written and/or oral confidential and proprietary information relating to the Assets and to engage in confidential discussions pertaining to the prospective Transaction. For purposes of this Agreement, the term "**Confidential Information**" shall include, without limitation:

1. all information, data, reports, analyses, compilations, studies, interpretations, projections, forecasts, records and other materials (whether prepared by the Receiver or Keen or otherwise and in whatever form maintained, whether documentary, computerized or otherwise) related or pertaining to the Assets;

2. all notes, summaries, or other material derived therefrom, that contain or otherwise reflect information concerning the Assets and that are disclosed in the course of Prospect's evaluation of a possible Transaction; and

3. the fact of Prospect's possible interest in a Transaction, the fact of Prospect's communications with the Receiver and/or Keen regarding the Assets and/or a Transaction, the possibility of Prospect making a Transaction offer, and/or any and all details regarding the terms and conditions of Prospect's anticipated Transaction offer, if any; and

WHEREAS, the parties hereto intend for this Agreement to be binding upon their respective affiliates and each of their respective officers, directors, employees, financial partners, lenders, advisors, attorneys, accountants, consultants, agents and representatives (collectively, "**Representatives**").

NOW WHEREFORE, Receiver agrees to disclose, and Prospect agrees to receive and use, such Confidential Information subject to terms and conditions set forth below:

## Confidentiality

1.	Prospect agrees:

    a. not to use (and to direct its Representatives not to use) any Confidential Information except for the sole purpose of evaluating the merits of a potential Transaction and the terms thereof;

    b. to keep confidential and not to disclose any Confidential Information to persons or entities other than its Representatives with a need to know the information contained therein; *provided*, that such Representatives shall be bound by obligations of confidentiality materially the same as the confidentiality and non-use terms of this Agreement, have been informed of the confidential nature of the Confidential Information and are directed to abide by and have agreed to the terms of this Agreement;

    c. to maintain adequate procedures to preserve the confidentiality of the Confidential Information, such procedures to be at least equal to the procedures it would use to protect its own mostly highly confidential information. In the event of a dispute between the Parties, Prospect shall bear the burden of demonstrating that the standard of care described herein was used to protect the Confidential Information;

    d. not to disclose: (i) that the Confidential Information has been made available to Prospect; (ii) that Prospect and/or its Representatives have inspected the Assets; (iii) that Prospect may be considering a Transaction; (iv) that Prospect and/or its Representatives have had, are having or propose to have any discussions or negotiations with Receiver with respect to the Assets; and/or (v) that Prospect and/or its Representatives are bidding for a Transaction (the foregoing being deemed Confidential Information); and

    e. not to communicate regarding the Confidential Information and/or the Transaction with Receiver's employees, customers, vendors, secured creditors and/or unsecured creditors without the prior written consent of Receiver. For the avoidance of doubt, nothing in this Agreement will restrict or preclude the Prospect's or its Representatives' communications in the ordinary course of Assets unrelated to the Transaction.

2. Prospect represents and warrants to Receiver that Prospect has a good faith interest in a Transaction and that Prospect's request for and receipt of Confidential Information is solely to facilitate the Transaction. Every request made by Prospect for Confidential Information, or action by Prospect to gain access to Confidential Information, shall constitute Prospect's reaffirmation and acceptance of the terms and conditions of this Agreement.

3. Confidential Information shall not include any information that:

    a. is or becomes generally available to the public other than as a result of a disclosure by Prospect or any of its Representatives in violation of this Agreement,

    b. is already known to Prospect or its Representatives or is already in its or their possession prior to its disclosure to Prospect by the Receiver or its Representatives,

    c. becomes available to Prospect from a source other than the Receiver or its Representatives, provided that such source is not, to Prospect's knowledge after due inquiry, in breach of an obligation of confidentiality to the Receiver, or

    d. is independently developed by Prospect or its Representatives without reliance on Confidential Information.

4. Receiver may elect at any time to terminate further access by Prospect to the Confidential Information. Upon written request by Receiver, Prospect agrees to promptly destroy or return to the Receiver, at Prospect's option, all Confidential Information, and to confirm in writing (e-mail being sufficient) that all such material has been either returned or destroyed in compliance with this Agreement. Receiver and

Prospect further acknowledge that no such termination will affect their obligations of Confidentiality hereunder or those of their Representatives, all of which obligations shall continue in effect for the term of this Agreement. Notwithstanding the foregoing:

a. Prospect may retain copies of the Confidential Information and such portion of the Confidential Information that:

   i. are stored on Prospect's information technology backup and/or disaster recovery systems until the ordinary course deletion thereof;

   ii. may be found in any analyses, compilations, forecasts, studies, projections or other documents prepared by Prospect or its Representatives for Prospect's or its Representatives' files in accordance with such party's respective document retention policies;

   iii. Prospect is required to maintain in accordance with applicable governmental laws, rules and regulations;

   iv. Prospect's legal counsel advises in writing Prospect to retain; and/or

   v. are related or pertain to any dispute relating to or arising out of this Agreement; and

b. Prospect shall continue to be bound by the terms and conditions of this Agreement while Prospect retains Confidential Information pursuant to subparagraph (a) above.

## Disclosure

5. Voluntary or inadvertent disclosure of materials that are subject to the attorney-client privilege, the work-product doctrine, or any other privilege or immunity from discovery shall not constitute a waiver of, or an estoppel as to any claim of, such privilege or protection. Any party who has received inadvertently such materials shall, upon learning that such materials are subject to a claim of privilege, immediately return such materials to the party that produced them.

6. Prospect shall, in good faith, attempt to prohibit its Representatives from disclosing or using any Confidential Information consistent with the terms and conditions of this Agreement. If Receiver or Prospect discover that Prospect and/or one or more of its Representatives have disclosed or used Confidential Information in contravention of this Agreement, then Prospect hereby covenants to immediately notify Receiver thereof and to assist Receiver in recovering such Confidential Information and in mitigating any damages resulting therefrom and shall indemnify and hold Receiver harmless from any loss or damages suffered by Receiver resulting from any failure of an affiliate or Representative to maintain the confidential nature of the Confidential Information.

7. If requested or required (by law, court order, stock exchange, self-regulatory organization, governmental agency, regulatory body, oral questions, interrogatories, requests for information, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Prospect agrees, to the extent legally permissible, to provide the Receiver with prompt written notice of such request so as to allow the Receiver to seek an appropriate protective order and/or waive compliance with the provisions of this Agreement. If, failing the entry of a protective order or the receipt of a waiver hereunder, Prospect or Prospect's Representatives are, in the written opinion of Prospect's or Prospect's Representatives' counsel, as the case may be, required to disclose Confidential Information, Prospect may disclose only that portion of such information as is legally required without liability hereunder; *provided*, that Prospect agrees to exercise Prospect's reasonable efforts to obtain assurance that confidential treatment will be accorded such information. Notwithstanding anything in this Agreement to the contrary, Prospect and its Representatives may disclose Confidential Information

37348408.3
37395734.1

without notice, a protective order or other remedy where disclosure is in connection with a routine audit or examination by, or a document request from, a regulatory or self-regulatory authority, bank examiner or auditor that does not reference the Receiver or this Transaction.

### Disclaimer

8. Prospect agrees that no contract or agreement providing for any Transaction shall be deemed to exist between Prospect and the Receiver unless and until Prospect and the Receiver execute and deliver a final definitive agreement relating thereto (a "**Transaction Agreement**"), and Prospect hereby waives, in advance, any claims (including, without limitation, breach of contract) in connection with any Transaction unless and until Prospect and the Receiver shall have executed and delivered a Transaction Agreement. Prospect also agrees that unless and until Prospect and the Receiver shall have executed and delivered a Transaction Agreement, neither Prospect nor the Receiver will be under any legal obligation of any kind whatsoever with respect to a Transaction by virtue of this Agreement except for the matters specifically agreed to herein. Prospect further acknowledges and agrees that the Receiver reserves the right, in its sole discretion, to reject any and all proposals made by Prospect or Prospect's Representatives with regard to a Transaction, and to terminate discussions and negotiations with Prospect at any time. Prospect further understands that the Receiver shall be free to establish and change any process or procedure with respect to a Transaction as the Receiver in its sole discretion shall determine (including, without limitation, negotiating with any other interested party and entering into a Transaction Agreement with any other party without prior notice to Prospect or any other person). Prospect further acknowledges and agrees that any Transaction and the ultimate approval of the Transaction Agreement is subject to further Order of the Receivership Court.

9. Receiver and Keen will endeavor to include in the Confidential Information documents, data and information which they believe to be relevant for the purpose of Prospect's investigation. However, Prospect understands and agrees that the Receiver, Keen and their respective Representatives:

   a. have **not** audited any of the financial information;

   b. have **not** measured and certified the square footage and the acreage;

   c. have **not** themselves confirmed the zoning and/or any other governmental regulations nor Receiver's compliance therewith;

   d. have **not** made and/or will **not** make any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information except pursuant to the Transaction Agreement; and

   e. shall **not** have any liability whatsoever to Prospect or any of Prospect's Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom, except pursuant to the Transaction Agreement.

10. Prospect understands and agrees that, except pursuant to any Transaction Agreement that may be entered between the Receiver and Prospect, neither the Receiver, nor Keen, nor any of their respective Representatives:

    a. have made or make and expressly disclaim making any written or oral statements, representations, warranties, promises or guarantees, whether express or implied or by operation of law or otherwise, with respect to the Assets or with respect to the accuracy, reliability or completeness of the Confidential Information;

    b. to the fullest extent permitted by law, shall have any liability whatsoever to Prospect or any of Prospect's Representatives on any basis (including, without limitation, in contract, tort, under

federal, foreign or state securities laws or otherwise) as a result of, relating or pertaining to, or resulting or arising from Prospect's or Prospect's Representatives reliance on the Confidential Information, or Prospect's or Prospect's Representatives use or non-use of the Confidential Information, for any alleged acts or omissions of Receiver, Keen or any of their respective Representatives, or any errors or omissions in the Confidential Information;

c. shall have any liability or responsibility for any decisions made by Prospect or its Representatives in reliance on any Confidential Information;

d. will be under any obligation or duty (express or implied) to make available to Prospect or its Representatives any Confidential Information; and

e. will be under any duty or obligation (express or implied) to update, supplement, revise or correct any Confidential Information disclosed under this Agreement, regardless of the circumstances.

11. Prospects are advised to conduct their own due diligence prior to submitting an offer for the Assets and to engage the services of legal counsel, accountants and such other financial advisors as may be required to understand the Assets. The Confidential Information does not purport to be all-inclusive or to contain all of the information that Prospects may desire. The Receiver and/or Keen have not assumed responsibility for independent verification of any of the Confidential Information and have not, in fact, in any way audited the Confidential Information.

12. Without limiting the generality of the immediately preceding paragraphs, the Confidential Information may include certain statements, estimates and projections with respect to the Assets. Such statements, estimates and projections reflect various assumptions made by the Receiver, which assumptions may or may not prove to be correct. No representations are made as to the accuracy of such assumptions, statements, estimates or projections. The only information that will have any legal effect will be specifically represented in the Transaction Agreement, subject to such limitations and restrictions as may be specified therein.

### Confidential Information Supplied by Bank of America, N.A.

13. Prospect acknowledges and agrees that Bank of America has provided to the Receiver certain Confidential Information, including, without limitation: (i) that certain real estate appraisal dated December 5, 2023, with an effective date of November 21, 2023, conducted for Bank of America by National Valuation Consultants, Inc.; (ii) that certain Phase I Environmental Assessment of Notre Dame College Main Campus 4545 College Road, South Euclid, Cuyahoga County, Ohio 44121 dated August 18, 2016, prepared by Property Solutions Inc.; (iii) that certain Phase I Environmental Assessment of Notre Dame College Campus 1857 Lawnway Road, South Euclid, Cuyahoga County, Ohio 44121 dated August 18, 2016, prepared by Property Solutions Inc.; (iv) that certain Phase I Environmental Assessment of[LD1.1] Notre Dame College Residence 1887 Lawnway Road, South Euclid, Cuyahoga County, Ohio 44121 dated August 18, 2016, prepared by Property Solutions Inc, (v) that certain Phase I Environmental Assessment of Notre Dame College Residence 1899 Lawnway Road, South Euclid, Cuyahoga County, Ohio 44121 dated August 18, 2016, prepared by Property Solutions Inc.; (vi) that certain Phase I Environmental Assessment of Notre Dame College Residence 4602 College Road, South Euclid, Cuyahoga County, Ohio 44121 dated August 18, 2016, prepared by Property Solutions Inc, and (vii) other Confidential Information provided by Bank of America to the Receiver and/or Keen which may be disclosed to Prospect (collectively, the "Bank of America Confidential Information"). Prospect agrees that it is not authorized to contact any third-party, either directly or indirectly, regarding any aspect of the Bank of America Confidential Information without Bank of America's prior written consent. The Prospect hereby agrees to (a) treat the Bank of America Confidential Information confidentially and use the same efforts to protect the confidentiality of the Bank of America Confidential Information as the

37348408.3
37395734.1

Prospect uses to protect his/its own confidential information; and (b) not disclose the Bank of America Confidential Information to any person or entity, in whole or in part, other than to the Prospect's employees, attorneys, brokers, or other agents (who shall be advised of the confidential nature of the Bank of America Confidential Information).

14. Prospect acknowledges and agrees that the Bank of America Confidential Information does not represent the opinion of Bank of America. In no event shall Bank of America be bound by any statement or opinion contained in any Bank of America Confidential Information. Bank of America does not make any representations or warranties regarding the accuracy or completeness of the Bank of America Confidential Information or with respect to any other matter relating thereto. In no event shall Bank of America or any third-party provider of Bank of America Confidential Information have any liability to the Receiver, the Prospect or any other third party on account of, or relating to, the Bank of America Confidential Information. Prospect agrees that it will not disclose all or any portion of the Bank of America Confidential Information to any third- party without such party having first agreed in writing to be bound by the disclaimers, terms and conditions of this Agreement as if it were the party to this Agreement.

15. Prospect agrees to indemnify Bank of America, its parent, subsidiary, and affiliated banks and companies, and all of their respective officers, directors, agents, attorneys and consultants, and hold each of them harmless against any claim, cause of action, liability, expense, or loss, including reasonable attorneys' fees, directly or indirectly resulting from Keen, the Receiver, or Bank of America providing the Bank of America Confidential Information to the Prospect, or from the Prospect's use of the Bank of America Confidential Information or any information contained in the Bank of America Confidential Information.

**Dispute Resolution**

16. It is further understood and agreed that money damages would not be a sufficient remedy for any breach of this Agreement and that the Receiver shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, and Prospect further agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. Such remedy shall not be deemed to be the exclusive remedy for breach of this Agreement but shall be in addition to all other remedies available at law or equity to the Receiver. Nothing herein shall be construed to limit the rights and remedies of the Receiver in the event that this Agreement is breached by Prospect or any of Prospect's Representatives.

17. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio without regard to conflict of law principles (that might dictate the application of the laws of another jurisdiction). The parties hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the Receivership Court for any lawsuits, claims or other proceedings arising out of or relating to this Agreement, and hereby further irrevocably and unconditionally waive the right and agree not to plead or claim in any such court that any such lawsuit, claim or other proceeding brought in any such court has been brought in an inconvenient forum or that such court lacks jurisdiction over such party. **EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

18. Attorneys' Fees. If any party to this Agreement brings an action directly or indirectly based upon this Agreement or the matters contemplated hereby against any other party, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and arbitration and/or court costs.

37348408.3
37395734.1

**Miscellaneous**

19. It is understood that Keen will arrange for appropriate contacts for due diligence purposes in connection with the Transaction. Unless otherwise directed by the Receiver, all:

    a. communications regarding the Transaction,

    b. requests for additional information in connection with the Transaction,

    c. requests for Assets inspections in connection with the Transaction,

    d. discussions regarding making an offer in connection with the Transaction, and/or

    e. discussions or questions regarding procedures in connection with the Transaction,

    must be submitted or directed exclusively to Keen. Unless otherwise directed by the Receiver, neither Prospect nor Prospect's Representatives will initiate or cause to be initiated any communication with anyone known to Prospect to be an employee of the Receiver, to be a customer of Receiver, to be a supplier to Receiver and/or to be a lender to Receiver concerning the Confidential Information or the Transaction without Receiver or Keen's prior written consent.

20. Prospect warrants and represents that it is a principal acting on its own behalf, or a broker, finder or agent acting on another's behalf (collectively, "**Buyer's Broker**"), and any and all of its Representatives, shall be bound by the same terms set forth in this Agreement and such Buyer's Broker shall attest and certify to such terms set forth in this Agreement, on behalf of itself and any of its Representatives, by providing its signature below. Prospect and/or Buyer's Broker acknowledges that it will not look to the Receiver and/or Brokers and their respective Representatives for the payment of any fee or commission. Prospect hereby agrees to indemnify, defend and hold Receiver and Brokers and their respective Representatives harmless from and against any and all claims, damages, losses and liabilities, costs and expenses (including reasonable attorneys' fees and disbursements) arising out of any claim or claims by any Buyer's Broker for commissions, fees or other compensation who allege that they have dealt with the Receiver and/or Brokers in connection with the Property as a Buyer's Broker of Prospect. Prospect and/or Buyer's Broker understands that the Receiver and Brokers and their respective Representatives have not agreed to pay any brokerage commissions, finder's fee or other compensation in connection with Prospect's possible Transaction. If Prospect is working with a Buyer's Broker other than Brokers, Prospect agrees that Prospect shall be responsible for the payment of any fees, if any, to such Buyer's Broker.

21. Notice pursuant to this Agreement must be in writing, must be delivered by one of the methods set forth in this Section, and shall be deemed given (a) upon receipt, if delivered by hand, (b) within five days of transmission if delivered via certified mail, return receipt requested, or (c) within one business day of transmission, if delivered via Federal Express, UPS or other nationally recognized standard overnight delivery service to the parties as identified in the signature block below:

22. Prospect and/or Buyer's Broker understands and agrees that no failure or delay by the Receiver in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power, or privilege hereunder.

23. This Agreement represents the entire understanding and agreement of the parties hereto relating to the subject matter hereof and may be modified or waived only by separate writing executed by the Receiver and the Prospect and/or Buyer's Broker expressly so modifying or waiving such Agreement.

24.   The term of this Agreement shall expire upon the earlier of: (i) (2) years from the date hereof, or (ii) the date of execution of the Transaction Agreement.

25.   This Agreement may be signed electronically on the RevereCRE.com website.  If signed electronically this agreement shall become effective when Prospect indicates approval of this agreement by clicking on the "Electronic Records and Signature" block on RevereCRE.com website.

WHEREFORE, the Prospect has executed this Agreement electronically on RevereCRE.com website as of the Effective Date.

**RECEIVER:**
Name: David M. Baker
Solely in his capacity as the Court-appointed Receiver
and not in his individual capacity
Email: dbaker@auroramp.com